No. 83,423

IN THE MATTER OF THE APPEAL OF JOSEPH & ELIZABETH BARTON-DOBENIN FROM AN ORDER OF THE DIVISION OF TAXATION ON ASSESSMENT OF INCOME TAX, PENALTY, AND INTEREST.

(9 P.3d 9)

Opinion filed July 21, 2000.

*C. David Newbery*, of Newbery & Ungerer, of Topeka, argued the cause and *Douglas C. Fincher*, of the same firm, was with him on the briefs for appellant.

*James Bartle*, general counsel, Kansas Department of Revenue, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Taxpayers Joseph and Elizabeth Barton-Dobenin appeal from an order issued by the Board of Tax Appeals (BOTA) denying them a Kansas individual income tax credit for the 1995 tax year for taxes paid to the Czechoslovakian Republic. The taxpayers argue that the Department of Revenue's interpretation of K.S.A. 79-32,111(a) (Ensley 1989) allowing a partial credit for taxes paid to other states but not for taxes paid to other nations, violated the Foreign Commerce Clause of the United States Constitution. U.S. Const. art I, § 8, cl. 3. For the reasons set forth, we affirm.

Taxpayers Joseph and Elizabeth Barton-Dobenin, husband and wife, are citizens of the United States and have been residents of the state of Kansas since 1958. Joseph Barton-Dobenin was born and raised in Czechoslovakia. He emigrated to the United States and in 1948, all of his family's property in Czechoslovakia was seized by the Communist regime.

Joseph, along with his brothers Cyrill and George, successfully reclaimed title to their family's property in 1993. The property consists of income-producing commercial real estate in the cities of Prague and Nachod, as well as 6,000 acres of farmland and timber. Joseph owns a one-third general partnership interest in the commercial property in Prague and in the farmland and timber, as well as a one-half general partnership interest in the commercial property in Nachod.

Joseph spent 15 weeks in Prague engaged in the management of his partnership interests in 1995 and spent the other 37 weeks of the year primarily in Kansas where he participated in the management of the partnership interests through activities such as telephone conversations, correspondence, management of personnel, and document review.

The income from Joseph's partnership interests is deposited in a Prague bank. According to testimony from Joseph, the majority of the income is reinvested in the various partnerships and some is also spent pursuing charitable interests in the Czechoslovakian Republic. Funds not expended or committed to charitable purposes in the Czechoslovakian Republic are periodically converted to United States dollars and transferred to the bank account held by the taxpayers in Manhattan, Kansas.

The taxpayers filed a 1995 federal income tax return reporting Czechoslovakian source income in the amount of $1,625,890. On that income, the taxpayers paid the Czechoslovakian Republic income taxes in the amount of $726,280. The taxpayers' United States federal income tax return reported a federal income tax liability in the amount of $677,297. However, the taxpayers were granted a federal income tax credit in the amount of $615,028 for foreign taxes paid to the Czechoslovakian Republic. Thus, the taxpayers' total United States federal income tax liability on their Czechoslovakian source income was $62,269.

The taxpayers reported a total adjusted gross income of $1,776,731 in their 1995 Kansas income tax return which included the Czechoslovakian source income of $1,625,890. The total Kansas income tax due was $113,074. The taxpayers then attempted to claim a credit in the amount of $104,028 for taxes paid to the Czechoslovakian Republic under the authority of K.S.A. 79-32,111 (Ensley 1989), which at that time allowed a partial credit for the amount of income taxes paid by a resident individual to another state. This claimed credit would have reduced the total Kansas income tax liability to $9,046 and resulted in the taxpayers receiving a Kansas refund in the amount of $3,654 when previous payments of taxes were taken into account.

The Kansas Department of Revenue disallowed the tax credit, finding that foreign taxes were not taxes paid to another state under the statute. The Department of Revenue assessed the taxpayers a balance due in the amount of $100,374 plus interest of $4,014.96. The taxpayers paid this amount under protest and appealed the Department of Revenue's assessment. After an administrative hearing, the hearing officer denied the taxpayers' appeal. The taxpayers then appealed to BOTA.

Before BOTA, the taxpayers argued (1) that the word "state" in K.S.A. 79-32,111(a) (Ensley 1989) should be interpreted to include foreign nations; (2) in the alternative, the statute is ambiguous and should be interpreted to allow the credit; (3) if the statute does not include foreign nations, it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and (4) if the statute does not include foreign nations, it violates the

Foreign Commerce Clause. The taxpayers stipulated that if the tax credit was allowed, it should be in the amount of $104,028.

BOTA held that the definition of "state" in K.S.A. 79-32,111(a) (Ensley 1989), did not include foreign nations. BOTA also held that it was without authority to address the taxpayers' Equal Protection Clause and Foreign Commerce Clause claims and affirmed the Department of Revenue's denial of the partial tax credit provided in K.S.A. 79-32,111(a) (Ensley 1989). The taxpayers appealed BOTA's decision to the Court of Appeals and the matter was transferred to this court pursuant to K.S.A. 20-3018(c).

Although the taxpayers raised several issues before BOTA, the sole issue raised in this appeal is whether the application of K.S.A. 79-32,111(a) (Ensley 1989) to the taxpayers violates the Foreign Commerce Clause of the United States Constitution. The constitutional question raised is one of first impression in this state. It must also be noted that our decision, while significant to the taxpayers in this case, will have limited application. In 1997, the Kansas Legislature amended K.S.A. 79-32,111(a) to include foreign nations within the definition of the word "state," with the effect of allowing a limited tax credit for taxes paid to foreign nations. L. 1997, ch. 126, § 48.

Normally, the standard of review regarding appeals from BOTA is governed by the Kansas Act for Judicial Review and Civil Enforcement for Agency Actions, K.S.A. 77-601 *et seq.* However, the sole issue in this case involves the taxpayers' claim that K.S.A. 79-32,111(a) (Ensley 1989) is unconstitutional because it violates the Foreign Commerce Clause of the United States Constitution. BOTA did not have jurisdiction to address the constitutionality of the statute. See *Zarda v. State,* 250 Kan. 364, 370, 826 P.2d 1365 (1992) (stating that BOTA has no authority to determine the constitutionality of a statute and that the issue must be raised when the case is on appeal before a court of law). Thus, the merits of the question raised are to be addressed for the first time in this appeal.

## Standard of Review

"The constitutionality of legislative enactments is presumed, and all doubts must be resolved in favor of a statute's validity." *State v. Wilkinson*, 269 Kan. 603, Syl. ¶ 1, 9 P.3d 1 (2000). Recently, this court in *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./ Kansas City*, 264 Kan. 293, 300, 955 P.2d 1136 (1998), clearly articulated the standard to be applied when the constitutionality of a statute is challenged on appeal:

" ' "The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. [Citations omitted.]

" ' "In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. [Citations omitted.]

" ' "Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. [Citations omitted.]" ' "

## Discussion

The statute in question, K.S.A. 79-32,111(a) (Ensley 1989), states:

"The amount of income tax paid to another state by a resident individual, resident estate or resident trust on income derived from sources in another state shall be allowed as a credit against the tax computed under the provisions of this act. Such credit shall not be greater in proportion to the tax computed under this act than the adjusted gross income for such year derived in another state while such taxpayer is a resident of this state is to the total Kansas adjusted gross income of the taxpayer."

Thus, the statute provided a credit against Kansas income tax liability for taxes paid to another state. It did not, however, provide a credit against tax liability for taxes paid to a foreign nation. The federal government, on the other hand, does provide a tax credit for taxes paid in foreign nations, whether the foreign nation characterizes such taxes as national, state, or local. See 26 U.S.C. § 901 (1994).

The Foreign Commerce Clause of the United States Constitution, like the Interstate Commerce Clause, comes from Art. I, § 8, cl. 3, which provides that "Congress shall have Power . . . to regulate Commerce with foreign Nations, and among the several

States, and with the Indian Tribes." The Commerce Clause represents not only an affirmative grant of power to Congress but also a negative command to the states that they may not, through the enactment of statutes or regulations, discriminate against or unduly burden interstate or foreign commerce. See *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 119 L. Ed. 2d 91, 112 S. Ct. 1904 (1992). This negative command is sometimes referred to as the "dormant" Foreign Commerce Clause. 504 U.S. at 309. The power to strike down legislation conflicting with the Foreign Commerce Clause is the same as the power of Congress to legislate under the Foreign Commerce Clause. See *Hughes v. Oklahoma*, 441 U.S. 322, 326 n.2, 60 L. Ed. 2d 250, 99 S. Ct. 1727 (1979).

Where a State seeks to tax the instrumentalities of foreign commerce, the State tax must meet several requirements. First, the tax must pass the same test as that which is used to evaluate laws affecting interstate commerce. See *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 444-46, 60 L. Ed. 2d 336, 99 S. Ct. 1813 (1979). Under that test, the state tax must be: (1) applied to an activity with a substantial nexus with the taxing state; (2) fairly apportioned; (3) not discriminatory towards interstate or foreign commerce; and (4) fairly related to the services provided by the State. *Japan Line*, 441 U.S. at 444-45. See *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977) (establishing this test for interstate commerce). In addition, a tax on foreign commerce must not create a substantial risk of international multiple taxation by subjecting foreign commerce to the risk of a double tax burden to which domestic commerce is not exposed and must not prevent the federal government from " 'speaking with one voice when regulating commercial relations with foreign governments.' " *Japan Line*, 441 U.S. at 451 (quoting *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285, 46 L. Ed. 2d 514, 96 S. Ct. 523 [1976]).

The Department of Revenue contends that the first four prongs of the analysis taken from *Complete Auto* do not apply to inquiries under the Foreign Commerce Clause. The Department argues that cases concerning the Foreign Commerce Clause after *Japan Line* do not discuss the *Complete Auto* test. In support of this conten-

tion, the Department cites *Kraft Gen. Foods, Inc. v. Iowa Dept. of Revenue and Finance*, 505 U.S. 71, 120 L. Ed. 2d 59, 112 S. Ct. 2365 (1992), and *Wardair Canada v. Florida Dept. of Revenue*, 477 U.S. 1, 91 L. Ed. 2d 1, 106 S. Ct. 2369 (1986). However, this assertion is patently incorrect.

It is true that the United States Supreme Court did not mention the *Complete Auto* test in *Kraft*. However, the only issue in *Kraft* was whether a business tax discriminated against foreign commerce, which is the third prong of the *Complete Auto* test. The other prongs of the *Complete Auto* test, as well as the additional factors set forth in *Japan Line*, were waived as noted by the Iowa Supreme Court in the case below. See *Kraft v. Dept. of Revenue and Finance*, 465 N.W. 2d 664, 667 (Iowa 1991) (stating "Kraft does not ask us to apply [the entire *Complete Auto* and *Japan Line* test] which is specifically applicable to foreign commerce; rather, it confines its argument to the third prong of *Complete Auto Transit*, claiming that Iowa's tax system unconstitutionally discriminates against foreign commerce"). Further, in *Wardair*, the United States Supreme Court explicitly set out the *Complete Auto* test along with the additional factors in *Japan Line* and stated "appellant concedes that Florida's tax satisfies the four-part test set out in Complete Auto." 477 U.S. at 8. Clearly, the *Complete Auto* test must be satisfied in a case under the Foreign Commerce Clause, along with the two additional factors provided by *Japan Line*.

However, of those six factors, the taxpayers in this case explicitly state that they are arguing only about the third prong of the *Complete Auto* test which requires that a tax be nondiscriminatory toward foreign commerce. Therefore, the other three prongs of the *Complete Auto* test, as well as the two prongs introduced in *Japan Line*, can be counted as satisfied.

The threshold inquiry in a Foreign Commerce Clause analysis that must be made is whether the tax at issue actually implicates foreign commerce. See *United States v. Lopez*, 514 U.S. 549, 559, 131 L. Ed. 2d 626, 115 S. Ct. 1624 (1995). The taxpayer has the burden of showing by "clear and cogent evidence" that the state tax results in extraterritorial values being taxed. *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 175, 77 L. Ed. 2d 545, 103 S. Ct.

2933 (1983). Much has been written and numerous cases have been decided by the United States Supreme Court regarding the States' power to regulate matters affecting commerce. As noted by Justice Kennedy in his concurring opinion in *Lopez*:

"[F]or almost a century after the adoption of the Constitution, the Court's Commerce Clause decisions did not concern the authority of Congress to legislate. Rather, the Court faced the related but quite distinct question of the authority of the States to regulate matters that would be within the commerce power had Congress chosen to act." 514 U.S. at 568-69.

However, very little guidance is given by the Court upon the application of the dormant Foreign Commerce Clause to the activity we now consider. It is important to recognize that we do not deal with a direct tax upon income as in *Kraft*, but rather a credit given by Kansas to its residents paying state income taxes in other states. Moreover, it is also important to recognize that the partial credit given by K.S.A. 79-32,111(a) (Ensley 1989) and the resulting Kansas tax is not a tax on the use of the channels of interstate or foreign commerce as in *Container Corp.*, nor is it a tax on the instrumentalities of foreign commerce, or persons or things in foreign commerce as in *Japan Lines* and *Container Corp.* Rather, the taxpayers' claim is that the tax is on activities having a substantial relation to foreign commerce. Further, the question is not presented to this court in the abstract, but it comes to us under very specific facts involving the application of a state income tax statute upon a resident of this state. See *Oklahoma Tax Comm'n. v. Chickasaw Nation*, 515 U.S. 450, 462-63, 132 L. Ed. 2d 400, 115 S. Ct. 2214 (1995).

The Department of Revenue argues that Foreign Commerce Clause scrutiny is inappropriate because the tax at issue is a personal income tax on a Kansas resident. We do not agree in every case that a personal income tax imposed by a sovereign on its residents escapes the Foreign Commerce Clause scrutiny. However, we do think that the nature of the resulting tax in this case is an important consideration.

The general principle that the receipt of income by a resident of the territory of a taxing sovereignty is a taxable event is universally recognized and has international acceptance. See *Oklahoma*

*Tax Comm'n.*, 515 U.S. at 463. The credit given by K.S.A. 79-32,111(a) (Ensley 1989) arises from a personal income tax on a Kansas resident. Consistent with due process, a State may tax 100% of the income of its residents, even that income which is earned outside of the taxing jurisdiction. *Oklahoma Tax Comm'n.*, 515 U.S. at 462-63. This is in direct contrast to the income of nonresidents; generally, a State may not tax nonresidents on value earned outside its borders, although it may tax an apportioned share of a unitary business where the tax bears a rational relationship between the income attributed to the State and the intrastate values of the enterprise. See *ASARCO, Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 315-16, 73 L. Ed. 2d 787, 102 S. Ct. 3103 (1982). The reason for this distinction between residents and nonresidents is that

"income tax is founded upon the protection afforded to the recipient of the income by the government of the Commonwealth of his residence in his person, in his right to receive the income and in his enjoyment of the income when in his possession. That government provides for him all the advantages of living in safety and in freedom and of being protected by the law. It gives security to life, liberty and the other privileges of dwelling in a civilized community. It exacts in return a contribution to the support of that government measured by and based upon the income, in the fruition of which it defends him from unjust interference." *Maguire v. Trefry*, 253 U.S. 12, 14, 64 L. Ed. 739, 40 S. Ct. 417 (1920).

See *N. Y. ex rel. Cohn v. Graves*, 300 U.S. 308, 312-313, 81 L. Ed. 666, 57 S. Ct. 466 (1937).

Clearly, the fact that resident income tax may be treated differently for due process purposes does not automatically absolve the tax from scrutiny under the Foreign Commerce Clause, for a tax may be consistent with due process but still violate the Foreign Commerce Clause. See *Quill Corp.*, 504 U.S. at 313 n.7. Nonetheless, the distinction demonstrates that the purpose of the income tax levy on residents is to provide services, benefits, and protections to that individual. While it is clear that a state income tax may, and in *Kraft* did, run afoul of the Foreign Commerce Clause, we think it significant that the credit given in this case and the state law concerned applies to a resident of the state of Kansas. The likelihood of the statute affecting foreign commerce is dimin-

ished by the universally accepted principle that a sovereign State retains power to tax its resident's income wherever earned.

The taxpayer has the burden of showing by clear and cogent evidence that the state tax at issue implicates foreign commerce. See *Container Corp. v. Franchise Tax Bd.*, 463 U.S. at 175. Authority under the Foreign Commerce Clause extends to three broad categories of activity: (1) the use of the channels of interstate or foreign commerce; (2) the instrumentalities of interstate or foreign commerce, or persons or things in interstate or foreign commerce; and (3) activities having a substantial relation to interstate or foreign commerce. *United States v. Lopez*, 514 U.S. at 558-59. The United States Supreme Court has defined commerce as follows:

" 'Commerce, undoubtedly, is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.' " *United States v. Lopez*, 514 U.S. at 553 (quoting the Court in *Gibbons v. Ogden*, 9 Wheat 1, 189-190, 6 L. Ed. 23 [1824]).

Significantly, the credit given to residents and the resulting tax is not a tax directly levied on foreign commerce. Rather, the credit given under conditions outlined in K.S.A. 79-32,111(a) (Ensley 1989) and the resulting tax is levied on a resident individual to pay for services that the resident receives from the State. The purpose of the Foreign Commerce Clause is to protect markets and participants in markets, not taxpayers as such. *General Motors Corp. v. Tracy*, 519 U.S. 278, 300, 136 L. Ed. 2d 761, 117 S. Ct. 811 (1997). It is not the purpose of the Foreign Commerce Clause to protect state residents from their own state taxes. *Goldberg v. Sweet*, 488 U.S. 252, 266, 102 L. Ed. 2d 607, 109 S. Ct. 582 (1989). In order for the Foreign Commerce Clause to be implicated, application of the statute must substantially affect foreign commerce. See *Lopez*, 514 U.S. at 559.

The taxpayers argue that the tax credit indirectly implicates foreign commerce, inasmuch as they are engaged in foreign commerce and the credit is denied on their income from this activity. However, their claim to foreign commerce is much more tenuous than that in other cases in which the Foreign Commerce Clause

has been invoked. In *Japan Line*, the objects taxed, cargo containers, were clearly instrumentalities of foreign commerce. See 441 U.S. at 446. In *Kraft*, the corporation involved was a nonresident unitary business operating with wholly owned subsidiaries in domestic and foreign markets, rather than a state resident. See 505 U.S. at 75-77. Further, in Kraft, there was a stipulation between the parties that the activity involved constituted foreign commerce, and even with this stipulation, there was disagreement as to whether this was actually the case. See 505 U.S. at 85-86, Rehnquist, C.J., dissenting.

The taxpayers contend that Joseph "personally and routinely sets in motion a number of activities" with the Czechoslovakian Republic "which are indisputably protected by the Commerce Clause." First, the taxpayers argue that Joseph regularly traveled to the Czechoslovakian Republic on business and that this should be counted as commerce under *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 137 L. Ed. 2d 852, 117 S. Ct. 1590 (1997), and *Hoke v. United States*, 227 U.S. 308, 57 L. Ed. 523, 33 S. Ct. 281 (1913). Neither of these cases directly support the taxpayers' assertion. In *Camps Newfound,* the tax imposed by Maine was a tax on real property which, through the use of a tax exemption, taxed summer camps whose primary clients were out-of-state campers more harshly than those who operated primarily for in-state residents. The connection to commerce in that case was clear in that the camps were providers of goods and services for both in-state and interstate guests. See 520 U.S. at 572-73. *Hoke* involved a criminal statute regarding the transport of prostitutes across state lines. The nexus with interstate transportation in *Hoke* was well established. See 227 U.S. at 322-23. By contrast, the personal income tax imposed by Kansas upon the taxpayers does not tax Joseph's movement, nor is it a tax on his business for the services which it provides to interstate or foreign travelers.

The taxpayers argue that Joseph utilizes international telephone lines and mail in communicating with his partners and associates in the Czechoslovakian Republic, as well as transmitting money across international lines. The taxpayers contend that this also is commerce, citing *U.S. v. Underwriters Assn.*, 322 U.S. 533, 549,

88 L. Ed. 1440, 64 S. Ct. 1162 (1944). However, while *Under-writers* recognizes that such transmission is commerce which is subject to federal regulation; again, the credit given and the resulting tax under K.S.A. 79-32,111(a) (Ensley 1989) in this case are not levied on the transmissions of the taxpayer.

The taxpayers also contend that Joseph provides personal management services to his business in the Czechoslovakian Republic; thus, he is in fact a "service industry" under the *Camps Newfound* case. Further, the taxpayers contend that Joseph is a "conduit through which Czech Crowns become U.S. dollars and U.S. dollars become Czech Crowns." The taxpayer in *Camps Newfound* operated a summer camp on real estate in Maine serving youth across the nation. In this sense, it was considered a service industry. The taxpayers in this case, however, provide management services to property Joseph owns in the Czechoslovakian Republic. The distinct differences between the taxpayer's claim to be a service industry and the facts supporting the claim of a service industry in *Camps Newfound* are apparent. Thus, the taxpayers' reliance upon *Camps Newfound* provides little support for the taxpayers' claim to be a service industry.

The taxpayers' reliance on *Kraft* to support their claim that Joseph is a conduit for exchange of Czechoslovakian Crowns for United States dollars and, thus, is engaged in foreign commerce, is also misplaced. In discussing the dormant Foreign Commerce Clause in *Kraft*, the United States Supreme Court noted that the flow of value between a parent company and its foreign subsidiaries constitutes foreign commerce. See 505 U.S. at 76. However, while the movement of income between domestic and foreign subsidiaries for the unitary business in *Kraft* was held to constitute foreign commerce, the movement and exchange of currency in this case is less so. According to the testimony, the majority of income earned in the Czechoslovakian Republic is reinvested in the various partnerships, while some is also spent pursuing charitable interests in the Czechoslovakian Republic. Funds not expended or committed are periodically converted to United States dollars and transferred to the bank account held by the taxpayers in Manhattan, Kansas. The activity here is nothing more than a withdrawal from a Cze-

choslovakian Republic bank and the deposit of those funds in a Kansas bank. Moreover, the tax in *Kraft* was a direct tax on the income of a nonresident foreign corporation instead of a credit against tax to a local resident.

In *Tetreault v. Franchise Tax Bd.*, 255 Cal. App. 2d 277, 63 Cal. Rptr. 326 (1967), an attorney, in a firm which had offices in San Francisco and Tokyo, and his wife argued that they should be given a credit for partnership income on which he paid income tax to Japan. They argued that failure to give such a credit was a violation of his privilege to engage in foreign commerce. The court stated that "[t]he taxpayers are not engaged in 'foreign commerce' merely because they receive income from a foreign source" and found that the Foreign Commerce Clause was not violated. 255 Cal. App. 2d at 283-84.

The taxpayers in the case at hand have a slightly better claim to involvement in interstate commerce than the attorney in *Tetreault*. Here, rather than simply passively receiving partnership income, at least one of the taxpayers, Joseph, was actively involved in managing the foreign business. However, the personal banking transaction may hardly be classified as affecting foreign commerce.

We recognize that in certain circumstances, a state income tax can have a substantial effect on foreign commerce. However, we are not satisfied that the taxpayers have clearly established under the facts of this case that their claimed activity results in the implication of the Foreign Commerce Clause, *i.e.* that the tax involved affects activities having a substantial relation to interstate or foreign commerce. *United States v. Lopez*, 514 U.S. at 558-59. Under the facts of this case, the tax is not imposed upon the taxpayers' travels to the Czechoslovakian Republic, their telephone or mail communications, their consulting or managerial services, or on the transmission of money across international lines. Rather, the tax in question is a personal income tax imposed on a resident of the state of Kansas for the purpose of reimbursing the state for protections it affords the individual.

A statute is not to be stricken down unless the infringement of the superior law is clear beyond substantial doubt. We hold that the taxpayers in this case have not met their burden to prove that

the tax involved in this case is subject to the Foreign Commerce Clause.

Affirmed.